# Judge Hellerstein

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
COSMOTRADE EXPORTS S.A.,

                                        Plaintiff,

-v-

NURSAN CELIK SANAYI VE HADDECILIC AS
and MERES LIMITED,

                                        Defendant.
------------------------------------------------------------x

RECEIVED
09 CV    AUG 2 8 2009
CASHIERS

**VERIFIED COMPLAINT**

Plaintiff, COSMOTRADE EXPORTS S.A. (hereinafter "COSMOTRADE"), by its attorneys, CHALOS & CO, P.C., as and for its Verified Complaint against Defendant, NURSAN CELIK SANAYI VE HADDECILIC AS (hereinafter "NURSAN") and MERES LIMITED (hereinafter "MERES") alleges upon information and belief as follows:

## JURISDICTION

1.      The Court has subject matter jurisdiction by virtue that the underlying claim herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28 U.S.C. § 1333.

## THE PARTIES

2.      At all times material hereto, Plaintiff, COSMOTRADE, was and still is a foreign business entity duly organized and existing pursuant to the laws of British Virgin Islands.

3.      At all times material hereto, Defendant, NURSAN, was and still is a foreign business entity with a principal place of business in Turkey.

4.    At all times material hereto, Defendant, MERES, was and still is a foreign business entity with a principal places of business in the Commonwealth of Dominica.

FACTS AND CLAIM

5.    On or about August 20, 2008, Plaintiff COSMOTRADE, as disponent-owners of the M/V SEA BREEZE, and Defendant, NURSAN, as charterers, entered into a charter party agreement for the carriage of a cargo of steel bars from Iskenderun, Turkey to Jeddah, Saudi Arabia. *A copy of the fixture recap is attached hereto as Exhibit "1." A copy of the charter party agreement is attached hereto as Exhibit "2."*

6.    This charter party is a maritime contract.

7.    Pursuant to the terms and conditions of the charter party agreement, COSMOTRADE and NURSAN agreed to the arbitration of disputes arising out of the maritime contract in London with English law to apply.

8.    The charter party further provided for damages for detention to be paid at the rate of USD 22,000.00 per day pro rata.

9.    The vessel incurred detention charges at the discharge port of Jeddah, Saudi Arabia, for 4.354167 days due to the slow discharging rate caused by the lack of trucks for direct delivery of the cargo and insufficient space for storing the cargo at the shipyard. Accordingly, the vessel incurred detention charges in the total amount of USD 95,791.67. *A copy of the Statement of Facts for the discharge port of Jeddah is attached hereto as Exhibit "3."*

10.    Despite demands by COSMOTRADE to Defendant NURSAN to pay for the detention charges in a timely manner, NURSAN, in breach of the terms of the August 20, 2008 charter party, has failed, neglected, and/or otherwise refused to pay Plaintiff for

such detention. *See Invoice Ref Number: D452/2008 dated August 27, 2009, attached hereto as Exhibit "4."*

11.    As a result of Defendant's failure to fulfill its obligations in accordance with the terms of the charter party, Plaintiff COSMOTRADE has sustained damages for unpaid detention in the total amount of USD 95,791.67.

12.    Pursuant to the terms of the charter party agreement, all disputes arising there under are to be submitted to London arbitration with English law to apply. Plaintiff COSMOTRADE will commence arbitration after the commencement of this action and jurisdiction is obtained over Defendant.

13.    This action is brought in order to obtain jurisdiction over Defendant and also to obtain security for Plaintiff's claims and in aid of the London arbitration.

14.    English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

15.    As best as can now be estimated, the Plaintiff COSMOTRADE expects to recover the following amounts in arbitration from Defendant NURSAN:

|   |   |   |
|---|---|---|
| A. | Principal claim: | *$ 95,791.67* |
| B. | Estimated interest on Principal claim: 3 years at 5.33%, compounded quarterly | *$ 23,920.75* |
| C. | Estimated Attorneys' fees/ Arbitration costs: | *$ 65,000.00* |
|   | **Total Claim** | **$ 184,712.42** |

16.    Therefore, COSMOTRADE'S total claim for breach of the maritime contract against Defendant NURSAN is in the aggregate USD 184,712.42.

17.    Defendant MERES is a receiving/paying agent of NURSAN, such that MERES is now, or will soon be, holding assets belonging to NURSAN.

18.    On or about September 11, 2008 and October 8, 2008, payments to Plaintiff, COSMOTRADE for the freight and for demurrage charges incurred at the loading port of Iskenderun, Turkey, were issued by MERES on behalf of NURSAN. *Copies of the relevant SWIFTs are annexed hereto as Exhibits "5" and "6", respectively.*

19.    It is not general practice in the maritime community, nor anywhere else, for independent companies to make or receive large payments on behalf of other independent companies.

20.    Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

21.    At all material times, Defendant MERES has disregarded the corporate form of Defendant NURSAN to the extent that Defendant MERES was actually carrying on NURSAN's business and operations as the same were their own, or vice versa.

22.    Based on the foregoing investigation, there are reasonable grounds to conclude that the Defendant MERES is the "paying agent" and/or "alter-ego" of Defendant NURSAN and, therefore, Plaintiff COSMOTRADE has a valid prima facie *in personam* claim against Defendant MERES based upon alter ego liability.

<u>BASIS FOR ATTACHMENT</u>

23.    Defendants NURSAN and MERES cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendants are believed to

have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendants within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

24.    Defendants NURSAN and MERES are engaged in international commerce, ships its products all over the world, and conducts business in U.S. Dollars. Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City. U.S. Dollars are the *lingua franca* of international commerce.

25.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City. The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

26.    Plaintiff believes that some of these assets of Defendants NURSAN and MERES, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendant; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendants and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC,

Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, State Bank of India, UBS AG, U.S. Bank, Wachovia Bank, and Wells Fargo Bank.

WHEREFORE, Plaintiff prays:

A.      That process in due form of law issue against the Defendants, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.      That since the Defendants cannot be found within the District, as set forth in the Declaration of George M. Chalos *(a copy of which is attached hereto as Exhibit "7")*, and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendants' tangible or intangible property or any other funds held by any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendants, up to the amount of **USD 184,712.42** to secure and satisfy the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.      That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
      August 28, 2009

                CHALOS & CO, P.C.
                Attorneys for Plaintiff
                COSMOTRADE EXPORTS S.A.

By:        _____
                George M. Chalos (GC-8693)
                123 South Street
                Oyster Bay, New York 11771
                Tel: (516) 714-4300
                Fax: (516) 750-9051
                Email: gmc@chaloslaw.com

# EXHIBIT 1

```
                    24-08-2009 13:14
                 "TURBULK CHARTERING - TR"<turbulk@turbulk.com>
From:
Sender:
                 "SEA POWER"<chart@seapower.gr>;
To:
Cc:
Bcc:
Subject:         M/V SEA BREEZE
Date:            20/08/08 13:37:01
Attachments:     SEA BREEZE DESCR.doc,
```

REF: 069418@-UK 20-08-08/13:21:29

FM: TURBULK CHARTERING ISTANBUL
    TEL: +90-216-4101545
    FAX: +90-216-4162590
    EMAIL: turbulk@turbulk.com


NAPOLEON/UMIT

RE: M/V SEA BREEZE

PLS NOTE TT CHARTS HEREBY LIFTED THEIR SUBS ON STEM SHIPPERS, RCVRS APPROVAL
SO VSL IS FIXED CLEAN AS FLLWS:-


Mv Sea Breeze
Multipurpose, Monsun Type hull N 243, general cargo vessel
Slovak republic Flag.
Built june 1983 Veb Warnowwerft Warnemunde Yard .
Tweendecker class RUSSIAN REGISTER


Dimensions:
LOA - 158.05 m
LBP - 146.00 m
moulded breadth - 23.05 m,
depth to maindeck - 13.40 m
depth to tweendeck - 9.20 m
freeboard draft - 10.16m


Various:
DWT - 17330 ts
Constant: 350 mts
Un-pumpable ballast: 120 mts
Middle Draft 10.18 m on ssw
Hold capacity: Grain/Bale 25872/23766 cbm
GRT/NRT: 13521/7621
Suez GRT/NRT: 14118.76/11584.40
Panama GRT/NRT: 14281.94/11041.80


Speed: laden abt 13 kns
Gear:
4 x 35 ts heavy cargo derricks ??? rigged according to the double topping lift system
with max. outreach over the ship' s side 6 m. 1 derrick each serve only 1 one hatch.
ho/ha 4 holds/7 weather/tw?en hatches hydraulically operated folding type hatch covers
7 tweendeck hatches flush.
ALL ABT AND WOG


ATTACHED FULL VSL'S DESCR.


- VSL PRESENTLY UNDER DISCH AT PORT SUDAN WITH ETC/S ON ABT 21ST AUG
  ETA CTZA FR LOADING ON ABT 26TH OF AUG. ETC/S ON ABT 29/30TH OF AUG
  ETA ISKENDERUN ON ABT 31 AUG/1ST SEPT AGW/WP.
- PLS ADV DISPORT ROTATION: CTZA - ISKENDERUN - JEDDAH

- OWS CONFIRM THAT VESSEL WILL BE UNDER FULL PANDI COVERAGE DURING
  THE CURRENCY OF THE CHARTER PARTY.
- OWNERS TO CONFIRM TT VESSEL/HEADOFFICE IS ISM APPROVED
- OWS CONFIRM THAT STOWAGE OF THE CGO WILL BE DONE UNDER MASTERS'
  CONTROLL AND SUPERVISION
- OWS WARRANT THAT DURING THE CURRENCY OF THIS CHARTER PARTY
  VSL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG WITHOUT CHARTS'
  WRITEN CONSENT
- VSL'S HULL AND MACHINERY INSURANCE SHALL BE FULLY MAINTAINED AND
  WILL NOT BE CHANGED.
- ARBITRATION IN LONDON/ENGLISH LAW TO APPLY


FOR,
- STEM, SHIPPERS, RCVRS APPROVAL ARE IN ORDER
- A/C NURSAN ISKENDERUN
- MIN 7,700/MAX 8,000 MTS IN CHOPT STEEL DEBARS IN BNDLS OF ABT 12 M LENGTH AND ABT 2
TS
- 1 GSPB ISKENDERUN AAA / 1 SB JEDDAH
- OWS TO CHECK AND SATISY ABT DISPORT RESTRICTIONS BY THEMSELVES
- AS FULL OR PART CGO IN OWS OPTION
- LAYCAN 31 AUG/8TH SEP 2008
- LDG: 3000 MTS PWWD OF 24 CONSEC HRS SHINC BASIS 3 HO/HA/CRANE
- DISCH: LINER OUT UNDER HOOK
- MIN 3 HOLD, HACTH, WINCH TO BE SIMULTANEOUSLY ALLOCATED FOR THIS PARCELL.
- FRT USD 78.50 PMT FILO S L/S/D
- 100 PCT OF FRT, LESS COMMISSION , PAYABLE W/I 3 BDYS AFTER SIGNING
  FRT PPD BS/L. BS/L TO BE KEPT IN  LOADING PORT AGENT  CUSTODY BUT ONLY TO BE
  RELEASED  UPON  FRT BEING RECEIVED  BYOWNERS.
- FRT DEEMED EARNED DISCOUNTLESS, NON-RETURNABLE, SHIP AND OR CGO
  LOST OR NOT LOST.
- GENCON 08/14 CLS TO BE APPLY SHINC BASIS AT LOADING,
- TIME ACTUALLY USED BEFORE COMMENCEMENT OF LAYTIME NTC EIU.
- ALL PAYMENT TO THE OWS IN USD
- OWS/MASTER TO AUTHORIZE LOADING PORT AGENT TO ISSUE THE BS/L
  AND CERTIFICATES.
- ANY TAXES/DUES ON VSL/FRT TO BE FOR OWS ACCT BENDS
- ANY TAXES/DUES ON CGO TO BE FOR CHARTS ACCT BENDS
- NOR TO BE TENDERED B/W 08/17.00 HRS SHINC BSS W/W/W/W AT LOADING PORT
- BS/L TO BE MARKED ''CLEAN ON BOARD'' AND ''FREIGHT PREPAID''.
- AS THE BILLS OF LADING TO BE MARKED ''CLEAN ON BOARD'',
  MASTER HAS RIGHT TO REJECT UNSOUND CGO WHICH TO BE REPLACED BY
  SOUND ONE, SO BS/L AND M/R WILL BE CLEAN
- VSL HOLDS SHALL BE FREE FROM ANY KIND OF OBSTRUCTIONS TO ALLOW
  PROPER FORKLIFT WORK AND SHIFTING OF BUNDLES BY FORKLIFTS AND
  CRANES
- CARGO TO BE NATURAL OR ELECTRICAL VANTILATED IN  THE HOLDS DURING THE VOYAGE
- DEMM USD 22,000 PDPR / FD
- LOADING PORT DEM, IF ANY, TO BE PAID TOGETHER WITH FREIGHT, AGAINST SOF/NOR DULY
SIGNED BY MASTER,
  AGENTS AND T/S.
- BS/L TO SHOW EITHER ONLY THEORETICAL WEIGHT OR IN CHOPT THEORETICAL AND ACTUAL WEIGHT
TOGETHER
  BUT FRT WILL BE PAID BASED ON ACTUAL WEIGHT WHICH IS INDICATED IN CGO MANIFEST
APPROVED BY CUSTOM
  AUTHORITY, IN CASE ONLY THEORETICAL WEIGHT INSERTED INTO BS/L THEN M/R SHOULD ONLY
SHOW THEORETICAL
  WEIGHT AND 2ND SET CGO MANIFEST SHOWING ONLY THEORETICAL WEIGHT TO BE ISSUED AND
DELIVERED TO
  MASTER FOR DISCHARGING PORT FORMALITIES.
-    A SEPARATE CERTIFICATE ISSUED AND SIGNED BY LOADING PORT AGENTS OF THE VESSEL
STATING THAT THE
  VESSEL IS CLASSED A1 100  AS PER THE INSTITUTE CLASSIFICATION CLAUSE AND NOT
EXCEEDING 30 YEARS OF AGE.
  AND " CONFIRMING THAT VSL IS REGULAR LINER VESSEL"
- IN CHOPT, OWS CONFIRM THAT OWS TO PROVIDE A VALID CERTIFICATE FOR CARGO GEAR AND

TACKLE
- IN CHOPT, SHIPMENT TO BE EFFECTED BY REGULAR LINER VESSEL, B/L MUST INDICATE THE SAME
- OWS CONFIRM THAT A CERTIFICATE TO BE ISSUED AND SIGNED BY THE LOADING PORT  AGENT
STATING THAT:
  1.NAME OF VESSEL         PREVIOUS NAME
  2.NATIONALITY OF VESSEL
  3.OWNER OF VESSEL
  4.VESSEL WILL CALL AT OR PASS THRU FOLLOWING PORTS ENROUTE TO
    SAUDI ARABIA:
    1   2   3   4    (PLS LIST PORTS)
  THE UNDER SIGNED ACCORDINGLY DECLARES THAT THE INFORMATION PROVIDED (IN RESPONSES 1
TO 4)
  ABOVE IS CORRECT AND COMPLETE AND THAT VESSEL IS NOT SCHEDULED TO CALL OR ANCHOR ANY
OTHER PORTS
- LOADING PORT AGENT: DENMAR SHIPPING
- DISPORT AGENT: OWS AGENT PLS ADV
- VSL TO BE FREE OF ANY EXINS DUE TO HER AGE/FLG ETC.
- O'WISE AS PER M/V ORIENTAL SUN /ACCT NURSAN C/P WITH 3.75 PCT COMM HERE ON FDD
END

PLS TENDER FIXING NOTICE

BRGDS/UMIT
TURBULK CHARTERING
AS BROKER ONLY

Mv Sea Breeze
Multipurpose, Monsun Type hull N 243, general cargo vessel
Slovak republic Flag.
Built june 1983 Veb Warnowwerft Warnemunde Yard .
Tweendecker class KM L3
+ cargo ship deep sea Heavy Cargo ICE III RMS-V AUT-0S.

Dimensions:
LOA - 158.05 m
LBP – 146.00 m
moulded breadth - 23.05 m,
depth to maindeck - 13.40 m
depth to tweendeck - 9.20 m
freeboard draft - 10.16m

Various:
DWT – 17330 ts
Constant: 350 mts
Un-pumpable ballast: 120 mts
Middle Draft 10.18 m on ssw
Hold capacity: Grain/Bale 25872/23766 cbm
GRT/NRT: 13521/7621
Suez GRT/NRT: 14118.76/11584.40
Panama GRT/NRT: 14281.94/11041.80

Speed and consumption:

laden
abt 13 kns on abt 22,5 mts of ifo 180 cst per day

ballast
abt 13 kns on abt 21,5 mts of ifo 180 cst per day

Above speed and consumption data are all "about" and valid for good/calm weather
conditions – sea not exceeding number 3 and wind not exceeding number 4 of
beaufort scale.

generator fuel consumption at sea - abt 2,8 mt mgo per day
generator fuel consumption in port idle - abt 2,0 mt mgo per day
generator fuel consumption with cargo gear working in port – abt  3,0 mt mgo per day
addiitionally vessel uses for maneuvering abt 0,65 mts of mgo per hour
boiler heating abt 1 mts of MGO per day (summer)
boiler heating abt 2 mts of mgo per day (winter)
additionally vessel uses abt 0.6 mts of mgo per day hrs while working of conditioner
additionally vessel uses abt 20 kg of mgo per hour during ballasting operations.

Vessel uses extra mgo in narrow waters and for powering reefer containers.

Container capacity:
90 Teus in holds

Deck strength:
forecastle 1.75 ts/sqm hold 2/4
maindeck 3.80 ts/sqm hold 1
tweendeck 2.80 ts/sqm tween 1
tweendeck 4.00 ts/sqm tween 2/4
tanktop      9.00 ts/sqm hold 1
tanktop     11.00 ts/sqm hold 2/4

| Stackweight per | TEU stack | FEU steck |
|---|---|---|
| bridge deck N 1 | 20 ts | |
| bridge deck N 2 | 10 ts | |
| forecastle deck | 40 ts | |
| N 1 hatchcovers | 20 ts | 30 ts |
| maindeck hold 1 | 40 ts | 60 ts |
| maindeck 2/4 | 43 ts | 65 ts |
| tweendeck | 40 ts | 60 ts |
| tanktop N 1 | 60 ts | 90 ca |
| tanktop 2/4 | 100 ts | 150 ts |

Gear:
4 x 35 ts heavy cargo derricks are rigged according to the double topping lift system
with max. outreach over the ship' s side 6 m.
1 derrick each serve only 1 one hatch.
1 x 90 ts heavy cargo derrick serve 2/3 hatches with max. outreach over the ship' s
side 7.20 m.

Holds/hatches:
4 holds/7 weather/tween hatches hydraulically operated folding type hatch covers
7 tweendeck hatches flush.

| | | | |
|---|---|---|---|
| Hatch 1 forecastle 18.60 x 13.00 | maindeck 18.60 x 10.40 | tween 18.55 x 10.40 | |
| Hatch 2 starb/port | 2 x 19.20 x 7.80 | 2 x 19.20 x 7.80 | |
| Hatch 3 starb/port | 2 x 19.20 x 7.80 | 2 x 19.20 x 7,80 | |
| Hatch 4 starb/port | 2 x 19.20 x 7.80 | 2 x 19.20 x 7.80 | |

| | n 4 | n 3 | n 2 | n 1 |
|---|---|---|---|---|
| Hold dimensions | | | | 24.60 |
| Upper tween length | | | | 21,80/11,0 |
| Beam (mean) | | | | 3.90 |
| Height | | | | 24.60 |
| Tweendeck length | 25.60 | 26.40 | 26.00 | 15.00 |
| Beam (mean) | 10.20/10.20 | 10.20/10.20 | 10.20/10.20 | 4.20 |
| Height | 4.20 | 4.20 | 4.20 | 21.20 |
| Lower holds length | 21.00 | 22.20 | 23.80 | 10,30 |
| Beam (mean) | 15.00 | 19.00 | 17.40 | 4.50 |
| Heigth | 7.62 | 7.62 | 7.62 | |

Engines:
Main engine K7Z 70/120 E manufacture VEB Dieselmotorenwerk Rostock (main
licebce) 6691 kw at 130 rpm actual now 5985 kw at 124 rpm.

Auxiliary machinery:
1 8 VD 26/20 AL-2 output 640 kw
1 8 VD 26/20 AL-2 output 640 kw
1 6 VD 26/20 AL-1 output 480 kw
1 4 VD 21/15 2 output 76 kw for emergency use only
380/220 Vlt / 50 Herts
$CO_2$ fitted in cargo holds and engine room.
Bunker capacity: 1100 ts ifo 180 cst , 230 ts mgo.
Fresh water max capacity: 170 mts
Call sign: OMKB
Inmarsat c tlx n  raythenon idn 426757010 tlx sbrz
          c.marconi idn  426757011 tlx sbrz

IMO N 8120832

-Fuel specification:
Fuel supplied to be according to following specification form:
IFO 180 CST
RME 25

|  |  |  |  |  |
|---|---|---|---|---|
| DENSITY AT 15 C | KG/M3 | MAX | - | 991,0 |
| KINEMATIC VISCOSTY AT 100 C | CST(1) | MAX | - | 25,0 |
| FLASH POINT | C | MIN | - | 60,0 |
| POUR POINT | C | MAX | - | 12,0 |
| CARBON RESIDUE | %M/M | MAX | - | 15,0 |
| ASH | %M/M | MAX | - | 0,10 |
| WATER | %V/V | MAX | - | 1,0 |
| SULPHUR | %M/M | MAX | - | 5,0 |
| VANADIUM | MG/KG | MAX | - | 200 |

MARINE GAS OIL
DMA

|  |  |  |  |  |
|---|---|---|---|---|
| DENSITY AT 15 C | KG/M3 | MAX | - | 890,0 |
| KINEMATIC VISCOSITY AT 40 C | CST(1) | MAX | - | 6,0 |
|  |  | MIN | - | 1,5 |
| FLASH POINT | C | MIN | - | 60 |
| POUR POINT WINTER | C | MAX | - | -6 |
| SUMMER | C | MAX | - | 0 |
| CLOUD POINT | C | MAX | - | - |
| CARBON RESIDUE |  |  |  |  |
| RAMSBOTTOM ON 10 % RES | %M/M | MAX | - | 0,2 |
| RAMSBOTTOM | %M/M | MAX | - | - |
| ASH | %M/M | MAX | - | 0,01 |
| SEDIMENT BY EXTRACTION | %M/M | MAX | - | - |
| WATER | %V/V | MAX | - | - |
| CETANE NUMBER |  | MIN | - | 40 |
| VISUAL INSPECTION |  |  |  | CLEAR |
| SULPHUR | %M/M | MAX | - | 1,5 |

All details 'about' and 'wog'

EXHIBIT 2

| 1. Shipbroker<br><br>SEA POWER MARITIME INC | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 AND 1994)<br>(To be used for trades for which no specially approved form is in force) |
|---|---|
| | **2. Place and date:** 20TH AUGUST 2008 |

| 3. Owners/ Place of business (cl.1)<br>DISPONENT OWNERS :COSMOTRADE EXPORTS S.A. BVI | 4. Chaterers/Place Of Business (Cl.1<br>NURSAN ISKENDERUN TURKEY |
|---|---|
| 5. Vessel's Name (Cl.1)<br>SEA BREEZE | 6. GT/NT (CL.1)<br>13521/7621 |
| 7. Dwt All Told On Summer Load Line In Metric Tons (Abt) (Cl.1)<br>17,330 MTS WITH MIDDLE DRAFT 10.18M ON SSW<br>9.Expected ready to load(abt) (CL.1)<br>31ST AUGUST 2008 | 8.Present Position (Cl.1)<br>- VSL PRESENTLY UNDER DISCH AT PORT SUDAN WITH ETC/S ON ABT 21ST AUG  ETA CTZA FR LOADING ON ABT 26TH OF AUG. ETC/S ON ABT 29/30TH OF AUG ETA ISKENDERUN ON ABT 31 AUG/1ST SEPT AGWWP. |
| 10. Loading Port Or Place (Cl.1)<br>1 GSPB ISKENDERUN AAAA | 11.Discharging Port Or Place (Cl.1)<br>1 SB JEDDAH |
| 12. Cargo (Also State Quantity And Margin In Owner's Option, If Agreed; If Full And Complete Cargo Not Agreed State "Part Cargo") (Cl.1)<br><br>MINIMUM 7,700 / MAXIMUM 8,000 MTS IN CHARTERERS OPTION STEEL DEBARS IN BANDLES OF ABT 12M LENGTH AND ABOUT 2 TS. PART OR FULL CARGO IN OWNERS OPTION. ||
| 13.Freight Rate (Also State Whether Freight Or Payable On Delivery) (Cl.4)<br>FREIGHT USD 78.5 PMT FILO S L/S/D | 14.  Freight Payment (State Currency And Method of Payment; Also Beneficiary And Bank Account (Cl.4)<br> SEE RIDER CLAUSE NR 16 |
| 15.State if vessel's cargo handling gear shall not be used (Cl.5)<br>SEE RIDER CLAUSE NR 24 | 16.Laytime (If Separate Laytime For Load And Disch. Is Agreed Fill In A) And B). If Total Laytime For Load And Disch., Fill In C) Only) (Cl.6) |
| 17.Shippers/ Place of business (Cl.6) | A) Laytime For Loading<br>SEE RIDER CLAUSE NR 19+20 |
| 18.Agents (Loading) (Cl.6)<br>SEE RIDER CLAUSE NR 46 | B) Laytime For Discharging<br>LINER OUT UNDER HOOK |
| 19.Agents (Discharging) (Cl.6)<br>SEE RIDER CLAUSE NR 46 | C) Total Laytime For Loading And Discharging |
| 20.Demurrage Rate And Manner Payable (Loading And Discharging) (Cl.7)<br>SEE RIDER CLAUSE NR 21 | 21.Cancelling Date (Cl.09)<br>8TH SEPTEMBER 2008 |
| 23.Freight Tax (state if for the Owners' account(Cl.13)(c)<br>................... | 22.General Average to be adjusted at(Cl.12)<br>LONDON, ENGLISH LAW TO APPLY |
| 25.Law And Arbitration (State 19(A), 19(B) Or 19(C) of Cl.19; If 19(c) Agreed Also State Place of Arbitration) (If Not Filled In 19(A) Shall Apply)(Cl.19)<br>ENGLISH LAW TO APPLY | 24.Brokerage commission and to whom payable (Cl.15)<br>................... |
| (a)State maximum amount for small claims/shortened arbitration    (Cl.19) | 26.Additional Clauses Covering Special Provisions, If Agreed<br><br>RIDER CLAUSES 18 – 51 TO BE FULLY INCORPORATED TO THIS CHARTER PARTY |

It Is Mutually Agreed That  This Contract Shall Be Performed Subject To The Conditions Contained In This Charter Party Which Shall Include Part I As Well  As Part II. In The Event Of A Conflict Of Conditions, The Provisions Of Part I Shall Prevail Over Those Of Part II To The Extent Of Such Conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

## PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

(Sec Cl. 19-20)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel 1
named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number 2
of metric tons of deadweight capacity all told on summer loadline stated in Box 7 3
now in position as stated in Box 8 and expected ready to load under this 4
Charter Party about the date indicated in Box 9, and the party mentioned as the 5
Charterers in Box 4 that: 6

The said Vessel shall, as soon as her prior commitments have been completed, 7
proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as 8
she may safely get and lie always afloat, and there load a full and complete 9
cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and 10
responsibility) as stated in Box 12, which the Charterers bind themselves to 11
ship, and being so loaded the Vessel shall proceed to the discharging port(s) or 12
place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near 13
thereto as she may safely get and lie always afloat, and there deliver the cargo 14
15

2. Owners' Responsibility Clause 16
The Owners are to be responsible for loss of or damage to the goods or for 16
delay in delivery of the goods only in case the loss, damage or delay has been 17
caused by personal want of due diligence on the part of the Owners or their 18
Manager to make the Vessel in all respects seaworthy and to secure that she is 19
properly manned, equipped and supplied, or by the personal act or default of 20
the Owners or their Manager. 21

And the Owners are not responsible for loss, damage or delay arising from any 22
other cause whatsoever, even from the neglect or default of the Master or crew 23
or some other person employed by the Owners on board or ashore for whose 24
acts they would, but for this Clause, be responsible, or from unseaworthiness of 25
the Vessel on loading or commencement of the voyage or at any time 26
whatsoever. 27

3. Deviation Clause 28
The Vessel has liberty to call at any port or ports in any order, for any purpose, 29
to sail without pilots, to tow and/or assist Vessels in all situations, and also to 30
deviate for the purpose of saving life and/or property. 31

4. Payment of Freight 32
(See Cl. 18) 32
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the 33
intaken quantity of cargo. 34

(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be 35
deemed earned and non-returnable, Vessel and/or cargo lost or not lost. 36
Neither the Owners nor their agents shall be required to sign or endorse bills of 37
lading showing freight prepaid, unless the freight, due to the Owners has 38
actually been paid. 39

(c) On delivery. If according to Box 13 freight, or part thereof, is payable at 40
destination it shall not be deemed earned until the cargo is thus delivered. 41
Notwithstanding the provisions under (a), if freight or part thereof is payable on 42
delivery of the cargo the Charterers shall have the option of paying the freight 43
on delivered weight/quantity provided such option is declared before breaking 44
bulk and the weight/quantity can be ascertained by official weighing machine, 45
joint draft survey or tally. 46

Cash for Vessel's ordinary disbursements at the port of loading to be advanced 47
by the Charterers, if required, at highest current rate of exchange, subject to 48
two (2) per cent to cover insurance and other expenses. 49
50

5. Loading/Discharging 50
(a) Costs/Risks 51
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, 52
tallied, lashed and/or secured and taken from the holds and discharged by the 53
Charterers, free of any risk, liability and expense whatsoever to the Owners. 54
The Charterers shall provide and lay all dunnage material as required for the 55
proper stowage and protection of the cargo on board, the Owners allowing the 56
use of all dunnage available on board. The Charterers shall be responsible for 57
and pay the cost of removing their dunnage after discharge of the cargo under 58
this Charter Party and time for removing such dunnage has been removed. 59
60

(b) Cargo Handling Gear 60
Unless the Vessel is gearless or unless it has been agreed between the parties 61
that the Vessel's gear shall not be used and stated as such in Box 15, the 62
Owners shall throughout the duration of loading/discharging give free use of 63
the Vessel's cargo handling gear and of sufficient motive power to operate all 64
such cargo handling gear. All such equipment to be in good working order. 65
Unless caused by negligence of the stevedores, time lost by breakdown of the 66
Vessel's cargo handling gear or motive power - pro rata the total number of 67
cranes / winches required at that time for the loading / discharging of cargo 68
under this Charter Party - shall not count as laytime or time on demurrage. 69

On request the Owners shall provide free of charge cranemen/winchmen from 70
the crew to operate the Vessel's cargo handling gear, unless local regulations 71
prohibit this, in which latter event shore labourers shall be for the account of the 72
Charterers. Cranemen / winchmen shall be under the Charterers' risk and 73
responsibility and as stevedores to be deemed as their servants but shall 74
always work under the supervision of the Master. 75

(c) Stevedore Damage 76
The Charterers shall be responsible for damage (beyond ordinary wear and 77
tear) to any part of the Vessel caused by Stevedores. Such damage shall be 78
notified as soon as reasonably possible by the Master to the Charterers or their 79
agents and to their Stevedores, failing which the Charterers shall not be held 80
responsible. The Master shall endeavour to obtain the Stevedores' written 81
acknowledgement of liability. 82

The Charterers are obliged to repair any stevedore damage prior to completion 83
of the voyage, but must repair stevedore damage affecting the Vessel's 84
seaworthiness or class before the Vessel sails from the port where such 85
damage was caused or found. All additional expenses incurred shall be for the 86
account of the Charterers and any time lost shall be for the account of and shall 87
be paid to the Owners by the Charterers at the demurrage rate. 88

6. Laytime 89
(a) Separate laytime for loading and discharging (See Cl. 19) 89
The cargo shall be loaded within the number of running days/hours as 90
indicated in Box 16, weather permitting, Sundays and holidays excepted, 91
unless used, in which event time used shall count. 92

The cargo shall be discharged within the number of running days/hours as 93
indicated in Box 16, weather permitting, Sundays and holidays excepted, 94
unless used, in which event time used shall count. 96
97

(b) Total laytime for loading and discharging 97
The cargo shall be loaded and discharged within the number of total running 98
days/hours as indicated in Box 16, weather permitting, Sundays and holidays 99
excepted, unless used, in which event time used shall count. 100

(c) Commencement of laytime (loading and discharging) 101
Laytime for loading and discharging shall commence at 13.00 hours, if notice of 102
readiness is given up to and including 12.00 hours, and at 06.00 hours next 103
working day if notice given during office hours after 12.00 hours. Notice of 104

readiness at loading port to be given to the Shippers named in Box 17 or if not 105
named, to the Charterers or their agents named in Box 18. Notice of readiness 106
at the discharging port to be given to the Receivers or, if not known, to the 107
Charterers or their agents named in Box 19. 108

If the loading/discharging berth is not available on the Vessel's arrival at or off 109
the port of loading/discharging, the Vessel shall be entitled to give notice of 110
readiness within ordinary office hours on arrival there, whether in free pratique 111
or not, whether customs cleared or not. Laytime or time on demurrage shall 112
then count as if she were in berth and in all respects ready for loading/ 113
discharging provided that the Master warrants that she is in fact ready in all 114
respects. Time used in moving from the place of waiting to the loading/ 115
discharging berth shall not count as laytime. 116

If, after inspection, the Vessel is found not to be ready in all respects to load/ 117
discharge time lost after the discovery thereof until the Vessel is again ready to 118
load/discharge shall not count as laytime. 119

Time used before commencement of laytime shall count. 120

* Indicate alternative (a) or (b) as agreed, in Box 16 121

7. Demurrage 122
Demurrage at the loading and discharging port is payable by the Charterers at 123
the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for 124
any part of a day. Demurrage shall fall due day by day and shall be payable 125
upon receipt of the Owners' invoice. 126

In the event the demurrage is not paid in accordance with the above, the 127
Owners shall give the Charterers 96 running hours written notice to rectify the 128
failure. If the demurrage is not paid at the expiration of this time limit and if the 129
vessel is in or at the loading port, the Owners are entitled at any time to 130
terminate the Charter Party and claim damages for any losses caused thereby. 131

8. Lien Clause 132
The Owners shall have a lien on the cargo and on all sub-freights payable in 133
respect of the cargo, for freight, deadfreight, demurrage, claims for damages 134
and for all other amounts due under this Charter Party including costs of 135
recovering same. 136
137

9. Cancelling Clause 137
(a) Should the Vessel not be ready to load (whether in berth or not) on the 138
cancelling date indicated in Box 21, the Charterers shall have the option of 139
cancelling this Charter Party. 140

(b) Should the Owners anticipate that, despite the exercise of due diligence, 141
the Vessel will not be ready to load by the cancelling date, they shall notify the 142
Charterers thereof without delay stating the expected date of the Vessel's 143
readiness to load and asking whether the Charterers will exercise their option 144
of cancelling the Charter Party, or agree to a new cancelling date. 145

Such option must be declared by the Charterers within 48 running hours after 146
the receipt of the Owners' notice. If the Charterers do not exercise their option 147
of cancelling, then this Charter Party shall be deemed to be amended such that 148
the seventh day after the new readiness date stated in the Owners' notification 149
to the Charterers shall be the new cancelling date. 150

The provisions of sub-clause (b) of this Clause shall operate only once, and in 151
case of the Vessel's further delay, the Charterers shall have the option of 152
cancelling the Charter Party as per sub-clause (a) of this Clause. 153

10. Bills of Lading (See Cl. 28) 154
Bills of Lading shall be presented and signed by the Master as per the "Con- 155
genbill" Bill of Lading form, Edition 1994, without prejudice to this Charter 156
Party, or by the Owners' agents provided written authority has been given by 157
Owners to the agents, a copy of which is to be furnished to the Charterers. The 158
Charterers shall indemnify the Owners against all consequences or liabilities 159
that may arise from the signing of bills of lading as presented to the extent that 160
the terms or contents of such bills of lading impose or result in the imposition of 161
more onerous liabilities than those assumed by the Owners under this Charter 162
Party. 163

11. Both-to-Blame Collision Clause 164
If the Vessel comes into collision with another vessel as a result of the 165
negligence of the other vessel and any act, neglect or default of the Master, 166
Mariner, Pilot or the servants of the Owners in the navigation or in the 167
management of the Vessel, the owners of the cargo carried hereunder will 168
indemnify the Owners against all loss or liability to the other or non-carrying 169
vessel or her owners in so far as such loss or liability represents loss of, or 170
damage to, or any claim whatsoever of the owners of said cargo, paid or 171
payable by the other or non-carrying vessel or her owners to the owners of said 172
cargo and set-off, recouped or recovered by the other or non-carrying vessel 173
or her owners as part of their claim against the carrying Vessel or the Owners. 174

The foregoing provisions shall also apply where the owners, operators or those 175
in charge of any vessel or vessels or objects other than, or in addition to, the 176
colliding vessels or objects are at fault in respect of a collision or contact. 177

12. General Average and New Jason Clause ENGLISH LAW TO APPLY 178
General Average shall be adjusted in London unless otherwise agreed in Box 179
22 according to York-Antwerp Rules 1994 and any subsequent modification 180
thereof. Proprietors of cargo to pay the cargo's share in the general expenses 181
even if same have been necessitated through neglect or default of the Owners' 182
servants (see Clause 2). 183

If General Average is to be adjusted in accordance with the law and practice of 184
the United States of America, the following Clause shall apply: "In the event of 185
accident, danger, damage or disaster before or after the commencement of the 186
voyage, resulting from any cause whatsoever, whether due to negligence or 187
not, for which, or for the consequence of which, the Owners are not 188
responsible, by statute, contract or otherwise, the cargo shippers, consignees 189
or the owners of the cargo shall contribute with the Owners in general Average 190
to the payment of any sacrifices, losses or expenses of a General Average 191
nature that may be made or incurred and shall pay salvage and special charges 192
incurred in respect of the cargo. If a salving vessel is owned or operated by the 193
Owners, salvage shall be paid for as fully as if the said salving vessel or vessels 194
belonged to strangers. Such deposit as the Owners, or their agents, may deem 195
sufficient to cover the estimated contribution of the goods and any salvage and 196
special charges thereon shall, if required, be made by the cargo, shippers, 197
consignees or owners of the goods to the Owners before delivery". 198

13. Taxes and Dues (See Cl. 23) 199
(a) On Vessel - The Owners shall pay all dues, charges and taxes customarily 200
levied on the Vessel, howsoever the amount thereof may be assessed. 201

(b) On cargo - The Charterers shall pay all dues, charges and taxes customarily 202
levied on the cargo, howsoever the amount thereof may be assessed. 203
204

(c) On freight - Unless otherwise agreed in Box 23, taxes levied on the freight 205
shall be paid for the Charterers' account. 206

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

**14. Agency**                                (See Cl. 46)                         207
In every case the Owners shall appoint their own Agent both at the port of      208
loading and the port of discharge.                                             209

**15. Brokerage**                                                              210
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight  211
and demurrage earned is due to the party mentioned in Box 24.                   212
In case of non – execution 1/3 of the brokerage on the estimated amount of     213
freight to be paid by the party responsible for such non-execution to the      214
Brokers as indemnity for the latter's expenses and work. In case of more       215
voyages the amount of indemnity to be agreed.                                  216

**16. General Strike Clause**                                                  217
(a) If there is a strike or lock-out affecting or preventing the actual loading of the  218
cargo, or any part of it, when the Vessel is ready to proceed from her last port or  219
at any time during the voyage to the port or ports of loading or after her arrival  220
there, the Master or the Owners may ask the Charterers to declare, that they    221
agree to reckon the laydays as if there were no strike or lock-out. Unless the  222
Charterers have given such declaration in writing (by telegram, if necessary)   223
within 24 hours, the Owners shall have the option of cancelling this Charter    224
Party. If part cargo has already been loaded, the Owners must proceed with      225
same, (freight payable on loaded quantity only) having liberty to complete with  226
other cargo on the way for their own account.                                  227

(b) If there is a strike or lock-out affecting or preventing the actual discharging  228
of the cargo on or after the Vessel's arrival at or off port of discharge and same  229
has not been settled within 48 hours, the Charterers shall have the option of    230
keeping the Vessel waiting until such strike or lock-out is at an end against     231
paying half demurrage after expiration of the time provided for discharging until  232
the strike or lock-out terminates and thereafter full demurrage shall be          233
payable until the completion of discharging, or of ordering the Vessel to a safe  234
port where she can safely discharge without risk of being detained by strike or   235
lock-out. Such orders to be given, within 48 hours after the Master or the       236
Owners have given notice to the Charterers of the strike or lock-out affecting the  237
discharge. On delivery of the cargo at such port, all conditions of this          238
Charter Party and of the Bill of Lading shall apply and the Vessel shall receive  239
the same freight as if she had discharged at the original port of destination,    240
except that if the distance to the substituted port exceeds 100 nautical miles,   241
the freight on the cargo delivered at the substituted port to be increased in     242
proportion.                                                                      243

(c) Except for the obligations described above, neither the Charterers nor the   244
Owners shall be responsible for the consequences of any strikes or lock-outs     245
preventing or affecting the actual loading or discharging of the cargo.          246

**17. War Risks ("Voywar 1993")**                                              247
(1) For the purpose of this Clause, the words:                                 248
(a) The "Owners" shall include the shipowners, bareboat charterers,             249
disponent owners, managers or other operators who are charged with the        250
management of the Vessel, and the Master; and                                  251

(b) "War Risks" shall include any war (whether actual or threatened), act of    252
war, civil war, hostilities, revolution, rebellion, civil commotion, warlike     253
operations, the laying of mines (whether actual or reported), acts of piracy,    254
acts of terrorists, acts of hostility or malicious damage, blockades            255
(whether imposed against all Vessels or imposed selectively against             256
Vessels of certain flags or ownership, or against certain cargoes or crews       257
or otherwise howsoever), by any person, body, terrorist or political group,      258
or the Government of any state whatsoever, which, in the reasonable             259
judgement of the Master and / or the Owners, may be dangerous or are            260
likely to be or to become dangerous to the Vessel, her cargo, crew or other     261
persons on board the Vessel.                                                    262

(2) If at any time before the Vessel commences loading, it appears that, in the  263
reasonable judgement of the Master and / or the Owners, performance of          264
the Contract of Carriage, or any part of it, may expose, or is likely to expose,  265
the Vessel, her cargo, crew or other persons on board the Vessel to War         266
Risks, the Owners may give notice to the Charterers cancelling this             267
Contract of Carriage, or may refuse to perform such part of it as may           268
expose, or may be likely to expose, the Vessel, her cargo, crew or other        269
persons on board the Vessel to War Risks; provided always that if this          270
Contract of Carriage provides that loading or discharging is to take place       271
within a range of ports, and at the port or ports nominated by the Charterers    272
the Vessel, her cargo, crew, or other persons on board the Vessel may be        273
exposed, or may be likely to be exposed, to War Risks, the Owners shall         274
first require the Charterers to nominate any other safe port which lies           275
within the range for loading or discharging, and may only cancel this            276
Contract of Carriage if the Charterers shall not have nominated such safe        277
port or ports within 48 hours of receipt of notice of such requirement.          278

(3) The Owners shall not be required to continue to load cargo for any voyage,   279
or to sign Bills of Lading for any port or place, or to proceed or continue on    280
any voyage, or on any part thereof, or to proceed through any canal or           281
waterway, or to proceed to or remain at any port or place whatsoever, as         282
where it appears, either after the loading of the cargo commences, or at          283
any stage of the voyage thereafter before the discharge of the cargo is           284
completed, that, in the reasonable judgement of the Master and / or the          285
Owners, the Vessel, her cargo (or any part thereof), crew or other persons       286
on board the Vessel (or any one of more of them) may be, or are likely to be,    287
exposed to War Risks. If it should so appear, the Owners may by notice           288
request the Charterers to nominate a safe port for the discharge of the          289
cargo or any part thereof, and if within 48 hours of the receipt of such          290
notice, the Charterers shall not have nominated such a port, the Owners           291
may discharge the cargo at any safe port of their choice (including the port      292
of loading) in complete fulfilment of the Contract of Carriage. The Owners        293
shall be entitled to recover from the Charterers the extra expenses of such      294
discharge and, if the discharge takes place at any port other than the            295
loading port, to receive the full freight as though the cargo had been            296
carried to the discharging port and if the extra distance exceeds 100 miles,      297
to additional freight which shall be the same percentage of the freight           298
contracted for as the percentage which the extra distance represents to           299
the distance of the normal and customary route, the Owners having a lien          300
on the cargo for such expenses and freight.                                       301

(4) If at any stage of the voyage after the loading of the cargo commences, it     302
appears that, in the reasonable judgement of the Master and / or the              303
Owners, the Vessel, her cargo, crew or other persons on board the Vessel          304
may be, or are likely to be, exposed to War Risks on any part of the route        305
(including any canal or waterway) which is normally and customarily used           306
in a voyage of the nature contracted for, and there is another longer route        307
to the discharging port, the Owners shall give notice to the Charterers that       308
this route will be taken. In this event the Owners shall be entitled, if the total  309
extra distance exceeds 100 miles, to additional freight which shall be the         310
same percentage of the freight contracted for as the percentage which the         311
extra distance represents to the distance of the normal and customary             312
route.                                                                            313

(5) The Vessel shall have liberty:-                                            314
(a) to comply with all orders, directions, recommendations or advice as to       315
departure, arrival, routes, sailing in convoy, ports of call, stoppages,          316
destinations, discharge of cargo, delivery or in any way whatsoever which        317
are given by the Government of the Nation under whose flag the Vessel            318
sails, or other Government to whose laws the Owners are subject, or any           319
other Government which so requires, or any body or group acting with the         320
power to compel compliance with their orders or directions;                      321

(b) to comply with the orders, directions or recommendations of any war         322
risks underwriters who have the authority to give the same under the terms       323
of the war risk insurance;                                                       324

(c) to comply with the terms of any resolution of the Security Council of the     325
United Nations, any directives of the European Community, the effective          326
orders of any other Supranational body which has the right to issue and           327
give the same, and with national laws aimed at enforcing the same to which        328
the Owners are subject, and to obey the orders and directions of those who        329
are charged with their enforcement;                                             330

(d) to discharge at any other port any cargo or part thereof which may           331
render the Vessel liable to confiscation as a contraband carrier;                 332

(e) to call at any other port to change the crew or any part thereof or other      333
persons on board the Vessel when there is reason to believe that they may        334
be subject to internment, imprisonment or other sanctions;                       335

(f) where cargo has not been loaded, or has been discharged by the               336
Owners under any provisions of this Clause, to load other cargo for the           337
Owners' own benefit and carry it to any other port or ports whatsoever,          338
whether backwards or forwards or in a contrary direction to the ordinary or       339
customary route.                                                                 340

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this  341
Clause anything is done or not done, such shall not be deemed to be a            342
deviation, but shall be considered as due fulfilment of the Contract of           343
Carriage.                                                                        344

**18. General Ice Clause**                                                     345
Port of loading                                                                346

(a) In the event of the loading port being inaccessible by reason of ice when the  347
Vessel is ready to proceed from her last port or at any time during the voyage or  348
on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the    349
Master for fear of being frozen in is at liberty to leave without cargo, and this   350
Charter Party shall be null and void.                                            351

(b) If during loading the Master, for fear of the Vessel being frozen in, deems it  352
advisable to leave, he has liberty to do so with what cargo he has on board and   353
to proceed to any other port or ports with option of completing cargo for the      354
Owners' benefit for any port or ports including port of discharge. Any part        355
cargo thus loaded under this Charter Party to be forwarded to destination at the   356
Vessel's expense but against payment of freight, provided that no extra             357
expenses be thereby caused to the Charterers, freight being paid on quantity       358
delivered (in proportion if lumpsum), all other conditions as per this Charter       359
Party.                                                                           360

(c) In case of more than one loading port, and if one or more of the ports are      361
closed by ice, the Master or the Owners to be at liberty either to load the part    362
cargo at the open port and fill up elsewhere for their own account as under         363
section (b) or to declare the Charter Party null and void unless the Charterers      364
agree to load full cargo at the open port.                                       365

Port of discharge                                                               366

(a) Should ice prevent the Vessel from reaching the port of discharge the          367
Charterers shall have the option of keeping the Vessel waiting until the re-        368
opening of navigation and paying demurrage or of ordering the Vessel to a safe     369
and immediately accessible port where she can safely discharge without risk of      370
detention by ice. Such orders to be given within 48 hours after the Master or the   371
Owners have given notice to the Charterers of the impossibility of reaching port    372
of destination.                                                                 373

(b) If during discharging the Master for fear of the Vessel being frozen in deems it  374
advisable to leave, he has liberty to do so with what cargo he has on board and     375
to proceed to the nearest accessible port where she can safely discharge.          376

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall  377
apply and the Vessel shall receive the same freight as if she had discharged at      378
the original port of destination, except that if the distance of the substituted port   379
exceeds 100 nautical miles, the freight on the cargo delivered at the substituted    380
port to be increased in proportion.                                              381

**19. Law and Arbitration**                                                    382
(a) This Charter Party shall be governed by and construed in accordance with       383
English law and any dispute arising out of this Charter Party shall be referred to   384
arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or      385
any statutory modification or re-enactment thereof for the time being in force.      386
Unless the parties agree upon a sole arbitrator, one arbitrator shall be             387
appointed by each party and the arbitrators so appointed shall appoint a third       388
arbitrator, the decision of the three-man tribunal thus constituted or any two of     389
them, shall be final. On the receipt by one party of the nomination in writing of     390
their arbitrator the other party shall appoint their own arbitrator within             391
fourteen days, failing which the decision of the single arbitrator appointed shall    392
be final.                                                                        393

For disputes where the total amount claimed by either party does not exceed         394
the amount stated in Box 25* the arbitration shall be conducted in accordance       395
with the Small Claims Procedure of the London Maritime Arbitrators               396
Association.                                                                     397

(b) This Charter Party shall be governed by and construed in accordance with        398
Title 9 of the United States Code and the Maritime Law of the United States and     399
should any dispute arise out of this Charter Party, the matter in dispute shall be    400
referred to three persons at New York, one to be appointed by each of the           401
parties hereto, and the third by the two so chosen; their decision or that of any     402
two of them shall be final, and for the purpose of enforcing any award, this           403
agreement may be made a rule of the Court. The proceedings shall be                404
conducted in accordance with the rules of the Society of Maritime Arbitrators,       405
Inc.                                                                            406

For disputes where the total amount claimed by either party does not exceed         407
the amount stated in Box 25** the arbitration shall be conducted in accordance      408
with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators,     409
Inc.                                                                            410

(c) Any dispute arising out of this Charter Party shall be referred to arbitration at  411
the place indicated in Box 25, subject to the procedures applicable there. The       412
laws of the place indicated in Box 25 shall govern this Charter Party.              413

(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.   414

* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.        415

** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but  416
the other provisions of this Clause shall have full force and remain in effect.        417

<u>ADDITIONAL CLAUSES TO MV HENG TAI - CHARTER</u>
<u>PARTY DATED 26TH OF MAY 2006</u>

RIDER CLAUSE FOR CHARTER PARTY DATED 20TH AUGUST 2008
MV SEA BREEZE / ACC NURSAN ISKENDERUN

<u>Clause 18 Payment of Freight Clause</u>
100 pct of frt less add.comm to be paid as per total actual cargo quantity loaded and 3 (three) banking days after signing "Freight Prepaid" Bills of Lading.

B(s)/L to be marked "FREIGHT PREPAID". Bills of Lading to be kept in Loading port Agents custody but only to be released upon freight being received by Owners.

Freight to be paid on the total actual weight loaded. Freight to be paid upon presentation of fax invoice for 100 percent of freight less commission. All payments to be effected in USD.

Freight is deemed earned upon completion of loading and surrender of bill(s) of lading shall be discountless and non-returnable vessel and/or cargo lost or not lost.

<u>Clause 19 Laytime for Loading and Discharging Clause</u>
The cargo to be loaded, stowed/lashed, secured and dunnaged by the shippers / Charterers free of charge to the vessel (if any dunnage on board the vessel to be used by the shipper free of charge). The cargo to be loaded the rate of 3,000MT PWWD of 24 consecutive hours Saturday, Sunday and holidays included basis 3 holds / hatches / cranes.

The cargo to be discharged on liner out under hook basis.

Vessel not allowed to tender N.O.R. prior to commencement of laytimes. Time used before commencement of laytime not to be counted even if used.

<u>Clause 20 Notice to Readiness Clause</u>
At loading port notice to readiness to be tendered between 08:00 hours to 17:00 hours Saturdays Sundays holidays included basis, by written cable or telex whether in port or not, whether in berth or not, whether in free pratique or not and whether in custom clearance or not at loading port vessel being in all respect ready to load specified cargo.

If Notice of Readiness is given up to and including 12:00 time to commence at 14:00 hours, if Notice of Readiness is given after 12:00 time to commence at 08:00 hours next working day.

Before tendering notice of readiness vessel holds must be cleaned, swept, free of smell otherwise the N.O.R is not to be accepted by related parties or their servants and time so lost not to count. In case of any dispute in this manner, independent surveyor to be appointed and survey report to be binding for both parties. Survey expenses to be paid by the party proved wrong.

<u>Clause 21 Demmurage / Detention Clause</u>
At the loading port Charterers to pay Owners demmurage at the rate of USD 22,000.- per day prorata and free despatch on working time saved. Loading port demurrage to be paid together with freight, against Statement of Facts / Notice of Readiness duly signed by Master and Time Sheet.

<u>Clause 22 Cleanliness Clause</u>

## ADDITIONAL CLAUSES TO MV HENG TAI - CHARTER
## PARTY DATED 26TH OF MAY 2006

Vessel to be presented for loading with holds properly swept cleaned and dried ready to receive in all respect intended cargo. Stowage to be at master direction and responsibility. Owners to guarantee that the vessel is watertight by all means. Direct consequence or cost due to non watertightness of vessel to be for Owners account and time incurred not to count.

### Clause 23 Overtime Clause
Overtime to be for the account of the party ordering same. If ordered by port authorities same to be for Owners account. Officer and crew overtime always to be for the account of the Owners.

### Clause 24 Gear Clause
Shore crane expenses if any Charterers account at both ends.

The vessel shall always give free use winches and derricks up to their mentioned lifting capacities and to supply all running gear/falls runners and other necessary equipment as well as sufficient power day and night and provide for sufficient light on board on deck and holds for night work all if/when and where required free of charge. Any /all expenses incurred due to defective gear/equipment to be Owners account "subject to Owners prior consent" including stevedore standby expenses but maximum 1(one) shift resulting therefrom and hire of shore cranes.

### Clause 25 Shifting Clause
It is mutually understood the shifting between anchorage/berth to be for owner' account are strictly limited to vessel's arrival at load/discharge ports and departure purpose only, it is not include the shifting from berth to anchorage and re-berth during loading/discharge operations for give berth to othership.

### Clause 26 Stevedoring Clause
The stevedores, although appointed and paid for by shippers/receivers or their agents to work under the direction and supervision of the master. All claims for the damages allegedly caused by stevedores to be settled directly between owners and stevedores. Master to notify stevedores of damages, if any, in written 24 hours after occurrence at loading port and discharge port(s). However all damages occurred at load and discharge port to be notified to stevedores in writing before sailing the port and to be clearly proved by an independent survey company.

Otherwise stevedores/charterers not to be held liable except for hidden damages which to be notified to Charterers/stevedores prior to sailing from last port of discharge. Owners will do the best to get compensation for damages. However if the Owners are unable to get settlement from the stevedores within 45 days, the Charterers will be responsible for proved damages done by stevedores.

### Clause 27 P AND I Clause
Owners guarantee that the vessel is fully P and I covered and classed Lloyds highest or equivalent and will remain so during the currency of this voyage. The owners confirm vessel is ISM certified.

### Clause 28 Bill (s) of Lading Clause
Master/Owners authorize loading port Agent to issue the Bill(s) of lading and certificates.

B(s)/L to be marked "CLEAN ON BOARD" and "FREIGHT PREPAID". As the Bills of Lading to be marked "Clean on board" Master has the right to reject unsound cargo

## ADDITIONAL CLAUSES TO MV HENG TAI - CHARTER
## PARTY DATED 26TH OF MAY 2006

which to be replaced with sound one so Bills of Lading and Mate Receipts will be clean. Bills of Lading to be in strict conformity with Mate Receipts.

Charterers Bills of Lading format to be used. (congenbill or conbill to be used)

Master and Owners are to be responsible for the number of bundles and quantity, which is signed and issued by the master or agent complying bill(s) of lading and mate's receipts.
Bills of Lading to show either only theoretical weight or in Charterers option theoretical and actual weight together but freight will be paid based on actual weight which is indicated in cargo manifest approved by custom authority, in case only theoretical weight inserted into Bills of Lading then m/r should only show theoretical weight and 2nd set cargo manifest showing only theoretical weight to be issued and delivered to Master for discharging port formalities.

Liner out expenses differences between actual and theoretical weight to be for Charterers account.

### Clause 29 Tax /Dues Clause
At the port(s) load/discharge any taxes / dues on cargo to be for Charterers account.
At the port(s) load/discharge any taxes / dues on freight and/or vessel to be for Owners account.

Compulsory tally expenses, if any, at load port to be to be for Owners' account but at discharge port to be for Charterers' account, if any.

### Clause 30 Deviation Clause
Deleted.

### Clause 31 Vessel's Description Clause

### Clause 32 Vessel's Eligibility Clause
Deleted

### Clause 33 Arbitration Clause
Arbitration according to L.M.A.A. in London. This charter party to be governed and construed in accordance with English law.

### Clause 34 ETA Clause
Master/Owner of the vessel to give Charterers shippers/receivers and agents notice of vessel expected readiness at loading port on fixing also stating exact quantity of cargo required to be loaded on board subsequently. Master or Owners to give 5/3/2 days preliminary notice and 24 hours definite of arrival at load/discharging port(s). Such notices to be submitted by cable / telex or otherwise in writing. Warehouse and extra transport charges in this connection, such expenses to be paid by the Owners. Cargo stowage plan to be given to Charterers prior vessel's arrival loading port and to be subject to Charterers reconfirmation.

### Clause 35 Extra Insurance Clause
Vessel to be free of any extra insurance due to her age / flag etc.

### Clause 36

## ADDITIONAL CLAUSES TO MV HENG TAI - CHARTER PARTY DATED 26TH OF MAY 2006

Owners to authorize discharge of cargo to quay even in absence of original bills of lading, against Charterers written confirmation with Charterers' LOI or Receivers' bank guarantee.

**Clause 37**
Charter Party terms and conditions shall always be incorporated to the Bill of Lading and supersede bill(s) of lading whenever contradictory .

**Clause 38**
New Jason Clause, New Both to Blame Collusion Clause, General Clause Paramount and P and I Bunkering Clause are deemed to be incorporated in this Charter Party.

**Clause 39**
Owners warrant that vessel will not be sold for demolition before completion of discharge of cargo and before being released by receivers. If in breach of Charter Party Owners sell the vessel for demolition, Owners immediately shall pay any insurance penalty resultant thereof.

**Clause 40**
All cargo to be loaded in vessel's holds as customary and no cargo to be loaded into the deep tanks or unusual places not easily accessible to shippers or receivers otherwise all extra direct cost including loss of time to be born by the Owners.

**Clause 41**
Non applicable

**Clause 42**
Opening and closing of the hatches to be done by vessel's crew if permitted by local regulations, otherwise shore labour to be employed at Charterers expense.

**Clause 43**
In case of any part cargo any separation/segregation cost and time are for Owners account with understanding that such separation / segregation to be from other cargo only.

**Clause 44**
Vessel to be always left in seaworthy trim and stability to master's satisfaction for steaming between berths and ports.

**Clause 45**
Shippers, Charterers and receivers to have the option to use forklifts during loading and discharging operations. Owners to allow the use of forklifts. The weight of which not exceeding the vessel's tanktop strength in all compartments and warrant that the vessel is in every respect suitable to allow forklift operations.
Cargo to be natural or electrically ventilated in the holds during the voyage. Minimum 3 holds / hatch / winch to be simultaneously allocated for this parcel.

**Clause 46**
Charterers agents at load port : Denmar Denizcilik
Owners Agents at discharging port.

**Clause 47**

## ADDITIONAL CLAUSES TO MV HENG TAI – CHARTER
## PARTY DATED 26TH OF MAY 2006

Owners to check and satisfy themselves for discharging port restrictions.


### Clause 48
Negotiations and fixture to be kept strictly private and confidential.


### Clause 49
Type-written clauses or ammendments shall principally override the printed text of GENCON 94 Charter Party in the same topics.


### CLAUSE 50 CERTIFICATES
- A SEPARATE CERTIFICATE ISSUED AND SIGNED BY LOADING PORT AGENTS OF THE VESSEL STATING THAT THE VESSEL IS CLASSED A1 100 AS PER THE INSTITUTE CLASSIFICATION CLAUSE AND NOT EXCEEDING 30 YEARS OF AGE. AND " CONFIRMING THAT VSL IS REGULAR LINER VESSEL"
- IN CHOPT, OWS CONFIRM THAT OWS TO PROVIDE A VALID CERTIFICATE FOR CARGO GEAR AND TACKLE
- IN CHOPT, SHIPMENT TO BE EFFECTED BY REGULAR LINER VESSEL, B/L MUST INDICATE THE SAME
- OWS CONFIRM THAT A CERTIFICATE TO BE ISSUED AND SIGNED BY THE LOADING PORT AGENT STATING THAT:
  1. NAME OF VESSEL     PREVIOUS NAME
  2. NATIONALITY OF VESSEL
  3. OWNER OF VESSEL
  4. VESSEL WILL CALL AT OR PASS THRU FOLLOWING PORTS ENROUTE TO SAUDI ARABIA:
    1  2  3  4  (PLS LIST PORTS)
THE UNDER SIGNED ACCORDINGLY DECLARES THAT THE INFORMATION PROVIDED (IN RESPONSES 1 TO 4)
ABOVE IS CORRECT AND COMPLETE AND THAT VESSEL IS NOT SCHEDULED TO CALL OR ANCHOR ANY OTHER PORTS


### CLAUSE 51
Mv Sea Breeze
Multipurpose, Monsun Type hull N 243, general cargo vessel
Slovak republic Flag.
Built june 1983 Veb Warnowwerft Warnemunde Yard .
Tweendecker class RUSSIAN REGISTER

Dimensions:
LOA - 158.05 m
LBP - 146.00 m
moulded breadth - 23.05 m,
depth to maindeck - 13.40 m
depth to tweendeck - 9.20 m
freeboard draft - 10.16m

Various:
DWT - 17330 ts
Constant: 350 mts
Un-pumpable ballast: 120 mts
Middle Draft 10.18 m on ssw
Hold capacity: Grain/Bale 25872/23766 cbm
GRT/NRT: 13521/7621
Suez GRT/NRT: 14118.76/11584.40
Panama GRT/NRT: 14281.94/11041.80

### ADDITIONAL CLAUSES TO MV HENG TAI - CHARTER PARTY DATED 26TH OF MAY 2006

Speed: laden abt 13 kns
Gear:
4 x 35 ts heavy cargo derricks  rigged according to the double topping lift system
with max. outreach over the ship' s side 6 m. 1 derrick each serve only 1 one hatch.
ho/ha 4 holds/7 weather/tw?en hatches hydraulically operated folding type hatch covers
7 tweendeck hatches flush.
ALL ABT AND WOG

- VSL PRESENTLY UNDER DISCH AT PORT SUDAN WITH ETC/S ON ABT 21ST AUG
  ETA CTZA FR LOADING ON ABT 26TH OF AUG. ETC/S ON ABT 29/30TH OF AUG
  ETA ISKENDERUN ON ABT 31 AUG/1ST SEPT AGW/WP.
- PLS ADV DISPORT ROTATION: CTZA - ISKENDERUN - JEDDAH

- OWS CONFIRM THAT VESSEL WILL BE UNDER FULL PANDI COVERAGE DURING
  THE CURRENCY OF THE CHARTER PARTY.
- OWNERS TO CONFIRM TT VESSEL/HEADOFFICE IS ISM APPROVED
- OWS CONFIRM THAT STOWAGE OF THE CGO WILL BE DONE UNDER MASTERS'
  CONTROLL AND SUPERVISION
- OWS WARRANT THAT DURING THE CURRENCY OF THIS CHARTER PARTY
  VSL SHALL NOT CHANGE OWNERSHIP OR CLASS OR FLAG WITHOUT CHARTS'
  WRITEN CONSENT
- VSL'S HULL AND MACHINERY INSURANCE SHALL BE FULLY MAINTAINED AND
  WILL NOT BE CHANGED.

## ADDITIONAL CLAUSES

### BIMCO STANDART ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM ) Code in
relation to the vessel and there after during the currency of his Charter Party, the Owners shall
procure that both the vessel and "the company" (as defined by the ISM Code) shall comply with
a copy of the relevant Document of  Compliance (DOC) and Safety Management Certificate
(SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expence or delay caused by
failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the
Owners' account.

### ISPS Clause for Voyage Charter Parties

(a)  (i) From the date of coming into force of the International Code for the Security of Ships and
of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to
the Vessel, the Owners shall procure that both the Vessel and "the Company" (as defined by the
ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the
Company". Upon request the Owners shall provide a copy of the relevant International Ship
Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The
Owners shall provide the Charterers with the full style contact details of the Company Security
Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay,
excluding consequential loss, caused by failure on the part of the Owners or "the Company" to
comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their
full style contact details and any other information the Owners require to comply with the ISPS
Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding
consequential loss, caused by failure on the part of the Charterers to comply with this Clause

## ADDITIONAL CLAUSES TO MV HENG TAI - CHARTER
### PARTY DATED 26TH OF MAY 2006

shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at the demurrage rate.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Signature
(Owners)

Signature
(Charterers)

# EXHIBIT 3

DETENTION CLAIM ACCOUNT NURSAN CELIK SANAYI VE HADDECILIK A.S.

| M.V. SEA BREEZE CP DD 20/08/08 | | | PORT : JEDDAH | | | |
|---|---|---|---|---|---|---|
| FROM | TILL | HRS/MIN | PART OF DAY | % PERCENTAGE | PART OF PERIOD | DETAILS |
| 14/09/2008 19:00 | 15/09/2008 00:00 | 05:00 | 0.208333 | 0.00% | 0.000000 | 3 days allowance for discharging |
| 15/09/2008 00:00 | 16/09/2008 00:00 | 00:00 | 1.000000 | 0.00% | 0.000000 | 3 days allowance for discharging |
| 16/09/2008 00:00 | 17/09/2008 00:00 | 00:00 | 1.000000 | 0.00% | 0.000000 | 3 days allowance for discharging |
| 17/09/2008 00:00 | 17/09/2008 19:00 | 19:00 | 0.791667 | 0.00% | 0.000000 | 3 days allowance for discharging |
| 17/09/2008 19:00 | 18/09/2008 00:00 | 05:00 | 0.208333 | 100.00% | 0.208333 | Detention due to slow discharging rate/ lack of trucks / labours / space for damping |
| 18/09/2008 00:00 | 19/09/2008 00:00 | 00:00 | 1.000000 | 100.00% | 1.000000 | Detention due to slow discharging rate/ lack of trucks / labours / space for damping |
| 19/09/2008 00:00 | 20/09/2008 00:00 | 00:00 | 1.000000 | 100.00% | 1.000000 | Detention due to slow discharging rate/ lack of trucks / labours / space for damping |
| 20/09/2008 00:00 | 21/09/2008 00:00 | 00:00 | 1.000000 | 100.00% | 1.000000 | Detention due to slow discharging rate/ lack of trucks / labours / space for damping |
| 21/09/2008 00:00 | 22/09/2008 00:00 | 00:00 | 1.000000 | 100.00% | 1.000000 | Detention due to slow discharging rate/ lack of trucks / labours / space for damping |
| 22/09/2008 00:00 | 22/09/2008 03:30 | 03:30 | 0.145833 | 100.00% | 0.145833 | Detention due to slow discharging rate/ lack of trucks / labours / space for damping |
| | | | 7.354167 | | 4.354167 | |

| Detention Rate | $22,000.00 |
|---|---|
| Detention | $95,791.67 |

N.B

Vessel had on board about 8228 mt for Jeddah. Minimum allowed/ usual / customary discharging rate at Jeddah is 5000 PD.
However, Owners allowed maximum 3 days for discharging, which equals to about 2700 discharging rate PD.
As there were not enough trucks for direct delivery of cargo, no available gangs and not enough space for damping of cargo at Jeddah shipyard,
vesel finally consumed almost 8 days.
Kindly see relevant SOF as per attached for your information.

# EXHIBIT 4



# *COSMOTRANS*
## *NAVIGATION INC.*

**MESSRS**
**NURSAN CELIK SANAYI VE HADDECILIK AS.**

**REF NUMBER: D452/2008**

**DATE: 27/08/2009**

---

### REVISED DETENTION INVOICE

| | | |
|---|---|---|
| **ACCOUNT** | : | NURSAN CELIK SANAYI VE HADDECILIK AS.    CP DD 20/8/08 |
| **VESSEL** | : | MV    SEA BREEZE |
| **CARGO LOADED** | : | 8228.75 MT REINFORCING STEEL BARS |
| **PORT OF LOADING** | : | ISKENDERUN, TURKEY |
| **PORT OF DISCHARGE** | : | JEDDAH, SAUDI ARABIA |
| **DETENTION RATE** | : | USD 22000 PDPR |

DETENTION AT JEDDAH                                = USD  95,791.67

**BALANCE DUE TO OWNERS**                          = **USD  95,791.67**

PLEASE REMIT THE AMOUNT OF **USD 95,791.67** TO THE FOLLOWING ACCOUNT AND ADVISE SWIFT REMITTANCE DETAILS

BANK OF CYPRUS
PIRAEUS BRANCH - GREECE
21-23, ETH.ANTISTASEOS STR,
185 31 PIRAEUS - GREECE
PH: 210-6418129/FAX: 210-4175911

SWIFT CODE: BCYPGRAA
BENEFICIARY: COSMOTRANS NAVIGATION INC
IBAN NR: GR 7707 3000 2000 000000 4651725
REF: MV SEA BREEZE ACC NURSAN

CORRESPONDENT BANKS FOR USD ARE:
BANKERS TRUST COMPANY NEW YORK SWIFT: BKTRUS33
JP MORGAN CHASE  BANK NEW YORK    SWIFT: CHASUS33
CITIBANK NA NEW YORK              SWIFT: CITIUS33

# EXHIBIT 5

12-09-2008  13:07    FROM-

BRANCH    :  002  - CON PEIRAIA

INCOMING PAYMENT ADVICE

OUR REF.    :    PT0805120132YP03          VALUE DATE :    11/09/2008
ORD.BANK REF:    4847300255FC             SETTL. DATE :    12/09/2008

CUSTOMER DETAILS                          BNREF. DETAILS

NAME    :HERES LIMITED                    A/C NO    :
                                          NAME    :COSMOTRANS NAVIGATION INC
ADDRESS    :COPTHALL POBOX 2342
           ROSEAU,CW.OF DOMINICA          ADDRESS    :

                                          VAT NO    :

ORD.BANK    :CREDIT EUROPE BANK N.V.
COUNTRY     NL OAAXNAIA

P/O AMOUNT           :        622.759,74 USD
RATE                 :          1.0000000
EQUIVALENT           :        622.759,74 USD

TOTAL AMOUNT OF
CHARGES AND COMMISSIONS : (-)            ,00 USD                    ,00 EUR

AMOUNT CREDITED                       622.759,74 USD
LESS COMMISSIONS

      CREDITED A/C NO        CURRENCY        AMOUNT
1.          4651725           USD           622.759,74

ANY INTEREST CHARGES OR OTHER CHARGES (COMMISSIONS ETC) STATED IN
THIS DOCUMENT ARE EXEMPTED FROM VAT UNDER "ARTICLE 22 8KT & 8KE
N.2859/2000" (SAFE DEPOSIT BOX RENTALS ARE NOT EXEMPTED AND ARE
SUBJECT TO A VAT CHARGE OF 19%)

IBAN ACCOUNT NUMBER :

VALID WITHOUT SIGNATURE

12-09-2008  13:07    FROM-

ΤΡΑΠΕΖΑ ΚΥΠΡΟΥ ΔΗΜΟΣΙΑ ΕΤΑΙΡΕΙΑ ΛΙΜΙΤΕΔ          DATE : 12/09/08    PAGE :     1
ΣΩΝ ΠΕΙΡΑΙΑ                                        TIME : 12:56:00
Message No : 0809120132
                                    S.W.I.F.T.  Message

MT103 : Single Customer Credit Transfer
1:      Sender
        CHASUS33XXX0
        JPMORGAN CHASE BANK, N.A.
        4 NEW YORK PLAZA, FLOOR 15
        NEW YORK, NEW YORK
        JPMORGAN CHASE BANK, N.A.
        4 NEW YORK PLAZA, FLOOR 15
        NEW YORK, NEW YORK
2:      Receiver
        BCYPGRAAXXX
        {3:{108:484730025SFC} {119:STP}}
20:     Transaction Reference Number
        484730025SFC
23B:    Bank Operation Code
        CRED
32A:    Value Date, Currency and Amount
        Date     : 11/09/08
        Currency : USD
        Amount   : 622769.74
33B:    Currency/Instructed Amount
        0,00
50K:    Ordering Customer

        MERES LIMITED
        COPTHALL POBOX 2342
        ROSEAU, CW.OF DOMINICA
52A:    Ordering Institution - BIC
        FBHLNL2AXXX
        CREDIT EUROPE BANK N.V.
        6A, KARSPELDREEF
        AMSTERDAM
59:     Beneficiary Customer

        COSMOTRANS NAVIGATION INC
        GREECE
70:     Details of Payment
        /RFB/
        M V SEA BREEZE FREIGHT PMT
71A:    Details of Charges
        SHA
72:     Sender to Receiver Information
        /INS/IEVTU93N
        ///CHPREF/0264506
         -}

# EXHIBIT 6

09-10-2008  14:41    FROM-

BRANCH   :   002  - CON PEIRAIA

INCOMING PAYMENT ADVICE
-------------------------------------------------

| | | VALUE DATE : | 8/10/2008 |
|---|---|---|---|
| OUR REF.    : | FT0810090146IP03 | SETTL. DATE : | 9/10/2008 |
| ORD.BANK REF: | FT60810082782200 | | |

CUSTOMER DETAILS                         BENEF. DETAILS
                                         A/C NO   :
NAME     :MERES LIMITED                  NAME     :COSMOTRANS NAVIGATION INV
ADDRESS  :COPTHALL PDBOX 2342            ADDRESS  :
          ROSEAU,CW,OF DOMINICA
                                         VAT NO   :
ORD.BANK :CREDIT EUROPE BANK N.V.
COUNTRY

P/O AMOUNT          :        55.554,96 USD
RATE                :         1.0000000
EQUIVALENT          :        55.554,96 USD

TOTAL AMOUNT OF                                    ,00 USD                    ,00 EUR
CHARGES AND COMMISSIONS: (-)

AMOUNT CREDITED     :        55.554,96 USD
LESS COMMISSIONS

| CREDITED A/C NO | CURRENCY | AMOUNT |
|---|---|---|
| 57010002 | USD | 55.554,96 |
| 1. | | |

ANY INTEREST CHARGES OR OTHER CHARGES (COMMISSIONS ETC) STATED IN
THIS DOCUMENT ARE EXEMPTED FROM VAT UNDER "ARTICLE 22 SEC 1 SKE
N.2859/2000" (SAFE DEPOSIT BOX RENTALS ARE NOT EXEMPTED AND ARE
SUBJECT TO A VAT CHARGE OF 19%)

VALID WITHOUT SIGNATURE

09-10-2008  14:41   FROM-

ΤΡΑΠΕΖΑ ΚΥΠΡΟΥ ΔΗΜΟΣΙΑ ΕΤΑΙΡΕΙΑ ΛΙΜΙΤΕΔ        DATE :  9/10/08   PAGE :    1
CON ΠΕΙΡΑΙΑ                                        TIME : 14:29:57
Message No : 0810090146

S.W.I.F.T.  Message

| | |
|---|---|
| | MT103 : Single Customer Credit Transfer |
| 1: | Sender |
| | THE BANK OF NEW YORK MELLON |
| | FLOOR 5: 1290, AVENUE OF AMERICAS |
| | NEW YORK, NEW YORK |
| | THE BANK OF NEW YORK MELLON |
| | FLOOR 5: 1290, AVENUE OF AMERICAS |
| | NEW YORK, NEW YORK |
| 2: | Receiver |
| | {3:{108:FTS0810082782200}} |
| 20: | Transaction Reference Number |
| | FTS0810082782200 |
| 23B: | Bank Operation Code |
| | CRED |
| 32A: | Value Date, Currency and Amount |
| | Date      : 08/10/08 |
| | Currency : USD |
| | Amount    : 55554,96 |
| 33B: | Currency/Instructed Amount |
| | 0,00 |
| 50K: | Ordering Customer |
| | MERES LIMITED |
| | COPTHALL POBOX 2342 |
| | ROSEAU, CM.OF DOMINICA |
| 52A: | Ordering Institution - BIC |
| | FBHLNL2AXXX |
| | CREDIT EUROPE BANK N.V. |
| | 6A, KARSPELDREEF |
| | AMSTERDAM |
| 53A: | Sender's Correspondent - BIC |
| | THE BANK OF NEW YORK MELLON |
| | FLOOR 5: 1290, AVENUE OF AMERICAS |
| | NEW YORK, NEW YORK |
| 54A: | Receiver's Correspondent - BIC |
| | CHASUS33XXX |
| | JPMORGAN CHASE BANK, N.A. |
| | 4 NEW YORK PLAZA, FLOOR 15 |
| | NEW YORK, NEW YORK |
| | JPMORGAN CHASE BANK, N.A. |
| | 4 NEW YORK PLAZA, FLOOR 15 |
| | NEW YORK, NEW YORK |
| 59: | Beneficiary Customer |

09-10-2008  14:41    FROM-

TRAPEZA KYPROY DHMOSIA ETAIPEIA LIMITED          DATE : 9/10/08  PAGE :    2
CON PEIRAIA                                       TIME : 14:29:57
Message NO : 0810090146
                         S.W.I.F.T.  Message

COSMOTRANS NAVIGATION INV
70:     Details of Payment
        MV SEA BREEZE 0452 DEMURRAGE PMT
        BNY CUST REN ▬▬▬▬▬▬▬
71A:    Details of Charges
        SHA
        -)

# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
COSMOTRADE EXPORTS S.A.

                                        Plaintiff,          09 CV

  -v-                                      **ATTORNEY'S DECLARATION**
                                                    **THAT DEFENDANTS**
                                                    **CANNOT BE FOUND**
                                                    **WITHIN THE DISTRICT**

NURSAN CELIK SANAYI VE HADDECILIC AS
and MERES LIMITED,

                                      Defendants.
-----------------------------------------------------------------x

       This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiff, COSMOTRADE EXPORTS S.A., in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

       Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of perjury:

       I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiff in the above referenced matter.

       I am familiar with the circumstances of the Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the defendants, NURSAN CELIK SANAYI VE HADDECILIC AS and MERES LIMITED, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

       I have personally inquired or have directed inquiries into the presence of the defendants in this District.

I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of August 28, 2009, the defendants have not incorporated pursuant to the laws of New York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendants can be located within this District. The Verizon Telephone Company has advised me that the defendants do not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendants within this District.

I have engaged in a Google search as to whether the defendants can be located within this District. The Google search results did not provide any information that defendants are found in this District.

I am unaware of any general or managing agent(s) within this District for the defendants.

In that I have been able to determine that the defendants have not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendants can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendants do not have sufficient contacts or business activities within this District and do not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendants cannot be found within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: Oyster Bay, New York
   August 28, 2009

          CHALOS & CO, P.C.
          Attorneys for Plaintiff
          COSMOTRADE EXPORTS S.A.

By:      _____
        George M. Chalos (GC-8693)
        123 South Street
        Oyster Bay, New York 11771
        Tel: (516) 714-4300
        Fax: (516) 750-9051
        Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
COSMOTRADE EXPORTS S.A.

                                     Plaintiff,                    09 CV

-v-

                                                    **VERIFICATION OF**
**COMPLAINT**

NURSAN CELIK SANAYI VE HADDECILIC AS
and MERES LIMITED,

                                  Defendants.
-------------------------------------------------------------------x

        Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

        1.      I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff,

COSMOTRADE EXPORTS S.A., herein;

        2.      I have read the foregoing Verified Complaint and know the contents thereof; and

        3.      I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiff through its agents, underwriters and

attorneys.

        4.      The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

        I declare under penalty of perjury that the foregoing is true and correct.

Chalos & Co Ref: 2052.005

Dated: Oyster Bay, New York
       August 28, 2009

                              CHALOS & CO, P.C.
                              Attorneys for Plaintiff
                              COSMOTRADE EXPORTS S.A.


                  By:    _____
                              George M. Chalos (GC-8693)
                              123 South Street
                              Oyster Bay, New York 11771
                              Tel: (516) 714-4300
                              Fax: (516) 750-9051
                              Email: gmc@chaloslaw.com